Ruth Rizkalla (SBN: 224973)
Michael McDowell (SBN: 356528)
**The Carlson Law Firm, PC**
1230 Rosecrans Ave, Suite 300
Manhattan Beach, CA 90266
Phone: (254) 526-5688
Fax: (254) 526-8204
rrizkalla@carlsonattorneys.com
mmcdowell@carlsonattorneys.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| N.M., an individual,<br><br>      Plaintiffs<br><br>v.<br><br>LYFT, INC, A DELAWARE CORPORATION; AND DOES 1 THROUGH 50, INCLUSIVE,<br><br>      Defendants | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff N.M. by and through her undersigned counsel, makes the following Complaint against Defendants Lyft, Inc., a Delaware corporation ("Lyft"), and Does 1–50, inclusive (collectively "Defendants").

## NATURE OF THE ACTION

1.  Lyft is a transportation and technology company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting passengers. Since 2015, sexual predators driving for Lyft have continued to assault Lyft's passengers. For over ten years, Lyft has known of the ongoing sexual assaults of Lyft passengers. Complaints to Lyft by passengers who have been sexually harassed, assaulted, or otherwise attacked by Lyft drivers, combined with subsequent

1    criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these

2    continuing attacks by sexual predators driving for Lyft.

3        2.    Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly

4    inadequate. Lyft continues to hire drivers without performing adequate background checks.  Lyft

5    continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft

6    has failed to adopt and implement reasonable driver monitoring procedures designed to protect the

7    safety of its passengers. As a consequence, Lyft passengers continue to be victims of sexual assaults

8    and rapes by Lyft drivers.

9        3.    Plaintiff was assaulted by a Lyft driver. These events have had a devastating effect on

10   Plaintiff.  The trauma of the assault caused and continues to cause excruciating pain and suffering

11   and has had a catastrophic impact on Plaintiff's life and well-being. Unfortunately, there have been

12   many other sexual assault victims who, like Plaintiff, have been attacked and traumatized after they

13   simply contracted with Lyft for a safe to their destination.

14       4.    Passengers pay Lyft a fee in exchange for safe passage to their destination. Lyft's public

15   representations state that "safety is our top priority" and "it is our goal to make every ride safe,

16   comfortable and reliable." Sadly, Lyft's priority is not passenger safety. Profits are Lyft's priority.

17   As a result, Plaintiff and other passengers continue to be attacked by sexual predators driving for

18   Lyft.

19       5.    When faced with this sexual predator crisis, there are a number of potential safety measures

20   that a reasonable transportation or technology company would implement in order to address this

21   dangerous situation. Yet Lyft corporate management has failed to implement the most obvious and

22   straightforward safety procedures in order to address the growing problem of sexual assault by

23   those Lyft drivers who are sexual predators.

24       6.    Corporate decision-making with respect to passenger safety issues is centered at Lyft's

25   corporate headquarters in San Francisco. Decisions with respect to the vetting of Lyft drivers and

26   the supervision of Lyft driver's vis a vis the safety of its passengers are made and implemented in

27   its San Francisco, California headquarters.

28                                        **<u>PARTIES</u>**

7.   Plaintiff N.M. is an adult who is a resident of Arizona. The assault occurred in the vicinity of Phoenix, Arizona. At the time of the assault, Plaintiff was a resident of Arizona.

8.   Plaintiff files this action under a pseudonym because, as a victim of sexual assault, they need anonymity to protect their privacy in this sensitive and highly personal matter. Plaintiff proceeds in this manner to protect their legitimate privacy rights. Disclosure of her full name would expose her to stigmatization, it would invade her privacy, and it would make her vulnerable to retaliation. For these reasons, Jane Doe's need for anonymity outweighs both the prejudice to the Defendants and the public's interest in knowing her identity. Plaintiff's counsel will inform the Defendants of Plaintiff's true name and the circumstances surrounding these causes of action. Plaintiffs further anticipate seeking concurrence from Defendants for entry into a protective order to prevent the unnecessary disclosure of Plaintiff's real name in the public record.

9.   Defendant Lyft ("Defendant") is a Delaware Corporation with its principal place of business at 185 Berry Street, San Francisco, California. San Francisco is the center of corporate decision-making with respect to the hiring and supervision of Lyft drivers, safety precautions, passenger safety, as well as decision-making with respect to Lyft's response to the ongoing sexual attacks upon Lyft passengers.

10. The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 50, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff.   Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

11. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, each of the defendants herein was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each of the remaining defendants, and was at all times herein mentioned

acting within the course and scope of said relationship when Plaintiff was injured as set forth herein. Plaintiff is informed and believes that each and every defendant, when acting as a principal, was negligent in the selection, hiring, supervision or retention of each and every other defendant as an agent, servant, employee, assistant, or consultant. Plaintiff is further informed and believes, and thereon alleges, that at all times herein mentioned, each business, public entity  or corporate employer, through its officers, directors, supervisors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thereby ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each public entity, and corporate defendant by and through its officers, directors, supervisors and managing agents, and each individual defendant, authorized and ratified the wrongful conduct herein alleged.

12. Defendants are liable for each other's acts through principles of respondeat superior, agency, ostensible agency, partnership, alter-ego and other forms of vicarious liability.

## JURISDICTION AND VENUE

13. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

14. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### The Lyft App

15. Lyft is a transportation network company and technology company in the business of providing both a mobile-enabled application (hereinafter the "Lyft app") to its customers and providing ground transportation to those customers.

16. Users of the Lyft app pay for transportation (or "rides") through the Lyft app. Drivers are compensated by Lyft through the driver version of the Lyft app. Both versions of the app connect to the same website, which is Lyft's website.

17. The Lyft application is a mass-produced, mass-marketed mobile application which is a self-contained computer program or software package that users obtain by purchasing or downloading from various online stores, including the Apple Store or Google Play Store. Lyft designs, develops, manufactures, and controls all aspects of the Lyft app, including the functionalities of the Lyft app that are—or are not—available to users, including matching riders with drivers. Lyft made affirmative technological design choices to include the functionalities that it did in its design of the Lyft app and not to implement other functionalities, such as automatic GPS alerts, automatic ride recording, and gender matching options.

18. When users arrange transportation with the Lyft app, they input their destination and request a driver. The Lyft app then matches the user with a nearby driver, using an algorithm, who passengers then expect to take them safely to their destination. As Lyft knows, this does not always happen and hundreds of passengers have been sexually assaulted during the course of Lyft rides.

19. The Lyft app collects and maintains data on its users over time, which factor into Lyft's algorithm. During the course of a given Lyft ride, the Lyft app has the capability to—and does—collect additional data, including but not limited to GPS data.

## Lyft's Financial Model

20. The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.

21. Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.

22. Even today, the hiring of Lyft drivers occurs without any real screening.  Potential drivers merely fill out a form online. There is no interview either in person or through online platforms

COMPLAINT FOR DAMAGES

such as Skype or Zoom. There is no adequate background check and no biometric fingerprinting. Almost all online applicants become drivers. Once a Lyft applicant becomes a driver, Lyft fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. Lyft does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving. Lyft does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding Lyft's history of hiring sexual predators who have assaulted Lyft passengers, and notwithstanding the obvious and open subculture of Lyft drivers who harbor a sexual motivation for driving passengers, Lyft does nothing to warn its passengers about this very serious and real danger.

### Lyft's Control Over Its Drivers

23. Lyft exercises significant control over its drivers. Lyft executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.

24. Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App.

25. Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.

26. Lyft has the power to terminate drivers with or without cause.

27. Lyft drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.

28. Lyft provides its drivers with and requires them to use and display Lyft branding materials in order to make their drivers easily identifiable as Lyft drivers.

29. Lyft also allows for passengers to provide comments to Lyft regarding their experience with Lyft Driver. These comments are not shared with other passengers. Passengers are not provided

1 with any information regarding their driver other than a photograph, and other basic information

2 about the car. Passengers are not informed about prior complaints concerning particular drivers.

3     30. Within the app, Lyft does not tell passengers whether their comments regarding drivers are

4 shared with drivers, resulting in a ride share culture where passengers are fearful that giving honest

5 negative feedback could negatively impact their passenger star rating – or result in retaliation from

6 the driver.

7 **No Monitoring of Rides**

8     31. Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers,

9 the company should have implemented a monitoring system in order to protect its passengers. As a

10 technology company with access to a state-of-the-art in-app tracking system, as well as a camera

11 within the required mobile device, Lyft could take the following steps towards the elimination of

12 the sexual assaults by Lyft drivers:

13 • Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;

14 • Maintain a surveillance camera and rules requiring its continuing operation during all

15 rides and have footage saved and accessible for download for up to 72 hours after each

16 ride;

17 • Inform drivers that if they turn off the surveillance system during a Lyft ride, they will

18 never drive for Lyft again;

19 • Inform their drivers that they may not leave the car and accompany a passenger to their

20 home or to any other location outside the vehicle, other than to provide temporary and

21 time-limited assistance to a passenger; and

22 • Modify the functionality of the app so that Lyft can determine immediately if a driver

23 deviates from these protocols.

24 • Modify the functionality of the app to automatically record rides via audio and/or video

25 using either the built-in camera on the driver's phone or integrate with a dashcam

26 • Monitor rides and implement a system whereby passengers are required to confirm their

27 intention to terminate a ride before reaching their destination

28

- Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route.

32. The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft has known that a consequence of its business model has been exposing women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take any reasonable precautions to attempt to prevent harm to its passengers.

33. At the time of the actions alleged in this complaint Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations.

## Misrepresentations As to Safety

34. In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.

35. In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by Lyft's drivers.

36. Further, Lyft does not report statistics about sexual harassment or sexual assault by its drivers. Lyft does not disclose its policies or procedures on dealing with sexual assault by its drivers. Lyft does not properly train its customer service representatives on how to deal with serious allegations of driver misconduct. As a result, passengers who report sexual abuse by a driver have been later matched with the same driver, and dangerous drivers continue to drive with Lyft and assault passengers while Lyft profits from their actions. At the time of Plaintiff's attack, Lyft's guidelines for their drivers made no mention of sexual harassment or assault guidelines.

37. In short, Lyft fails to follow reasonable safety procedures and intentionally induces passengers to use Lyft's services while in a vulnerable state. As a result, Plaintiff and women like her are attacked, sexually harassed, assaulted, and raped by Lyft's drivers.

## Lyft's Inadequate Background Checks

38. Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.

39. Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check.

40. Neither Lyft nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between 3-5 days.

41. The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.

42. For example, most prospective taxi drivers are required by the taxicab companies to undergo criminal background checks that require the driver to submit fingerprints through a technology called "Live Scan." The fingerprint images are used to automatically search against all other

fingerprint images in government criminal record databases, including databases maintained by state law enforcement and the Federal Bureau of Investigation (FBI). The FBI's database includes criminal record information from all 50 states, including sex offender registries. If a person has a criminal history anywhere in the U.S., it will register as a match.

43. Fingerprints are not only a highly accurate way to confirm an individual's identity, they are also universally used among state and federal government agencies. This allows for the highest levels of information sharing among all relevant agencies – an element that is lacking when fingerprints are not used to verify identities.

44. Because of the unique identifying characteristics of fingerprints, the Live Scan process provides assurance that the person whose criminal history has been run is, in fact, the applicant. This would ensure that a convicted rapist or sexual predator could not use a false identification to become a Lyft driver.

45. Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These name-based criminal background checks are performed on publicly available databases and records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, there is no true national search performed, making these searches incomplete, limited and inaccurate.

46. Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Likewise, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes her name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

47. Lyft has refused to adopt fingerprint-based biometric checks and has in fact spent millions of dollars lobbying against local regulations requiring these checks.

COMPLAINT FOR DAMAGES

48. Despite advertising to passengers that "Your safety is important" and "Safety is our top priority," Lyft's background check process is designed for speed, not safety. In refusing to adopt reasonable safety procedures, Lyft makes clear that its priority is profit, not passenger safety.

**The Attack on Plaintiff**

49. On or about January 25, 2025, Plaintiff requested a ride from the Phoenix, Arizona to Scottsdale, Arizona, using the Lyft app.

50. The Lyft app assigned the ride to a driver ("Lyft Driver"). Lyft Driver arrived at Plaintiff's starting destination. Plaintiff got in the vehicle and the Lyft Driver began driving toward Plaintiff's final destination. The Plaintiff then fell asleep in the back seat. The Lyft Driver then began to digitally penetrate her while she was still sleeping and continued to do so after she woke up. Plaintiff asked the Lyft Driver to stop but the Lyft Driver continued and was masturbating while in the driver's seat. The Lyft Driver made sexual threats throughout the ride, which caused her to feel fearful and distressed. Plaintiff was humiliated and terrified as a result of the forced sexual contact and sexual threats. Though the Plaintiff eventually arrived at her destination, it took 52 minutes for a ride that should have taken, at most, 30 minutes. The Lyft Driver would not let Plaintiff out of the vehicle until she gave him her phone number. The Lyft Driver proceeded to stalk the Plaintiff after the incident.

51. Following the incident, Plaintiff has experienced increased anxiety, distress, and shame.

52. Lyft collected a fee for the Lyft trip that resulted in the sexual assault of Plaintiff.

53. By failing to take reasonable steps to confront the problem of multiple rapes and sexual assaults of Lyft passengers by Lyft drivers, Lyft has acted in conscious disregard of the safety of its passengers, including Plaintiff, and has breached its duty of reasonable care and has breached the implied and express covenants arising from its contract with its passengers.

54. Lyft is legally responsible for the harm to Plaintiff under a number of legal theories including vicarious liability for the intentional acts of its employees, basic negligence for failing to act with reasonable care when faced with multiple and ongoing attacks by its drivers, breach of the non-delegable duty of a transportation company to provide safe passage to its passengers, punitive damages for the conscious disregard of the safety of its female passengers, intentional and negligent

1    misrepresentations and breaches of contract, and express and implied covenants arising out of its

2    commercial contracts with its passengers, including Plaintiff.

### CAUSES OF ACTION

### COUNT I: GENERAL NEGLIGENCE

5    55. The preceding paragraphs of this Complaint are incorporated by reference.

6    56. By providing transportation to the general public using its application and network of

7    drivers, Lyft owed a duty to act with due and reasonable care towards the public and in particular its

8    own passengers, including Plaintiff.

9    57. Lyft has been on notice that its drivers have been sexually harassing, sexually assaulting,

10   and raping its passengers since 2015. Lyft was aware or should have been aware that some Lyft

11   drivers would continue to assault, sexually molest, sexually assault and/or rape their vulnerable Lyft

12   patrons and passengers.

13   58. Since learning of the sexual misconduct perpetrated by its drivers, Lyft never adapted or

14   improved its safety procedures in any meaningful way.

15   59. Lyft does not require video monitoring of its drivers that cannot be turned off, nor does it

16   provide emergency notification to Lyft and the authorities when a driver drastically veers off course

17   from the passenger's destination or abruptly cancels the ride.

18   60. Lyft is very well aware of the dangers its drivers pose yet induces vulnerable women like the

19   Plaintiff to enter Lyft cars. In doing so, Lyft fails to warn of the dangers of sexual harassment and

20   assault by Lyft's drivers.

21   61. Lyft does not require any sexual harassment/assault training of its drivers nor have any

22   policies in place for immediate termination if a driver engages in sexual misconduct.

23   62. Lyft does not cooperate with the police when a driver commits an illegal sexual attack on its

24   passengers. Despite having the express right to disclose driver information at Lyft's sole discretion,

25   Lyft requires that extensive standards be met before the company will even consider law

26   enforcement requests for information. Even after a report of sexual assault has been made, Lyft

27   generally requires a subpoena before it will release information. Of hundreds of law enforcement

28   requests for information in 2017, the company fully complied with only a fraction. Lyft's policy of

noncooperation discourages police agencies from making recommendations to District Attorney's offices to file complaints against Lyft drivers, and provides Lyft's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

63. When hiring new drivers, Lyft does not verify driver identities with biometric background checks. Lyft does not correct for false negatives created by its name-based screening procedures. Lyft does not provide industry-standard background checks which would provide the most comprehensive means of screening applicant drivers. Lyft does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

64. Lyft does not have a consistent, reliable system for addressing passenger reports of sexual harassment or assault by its drivers and continues to let dangerous predators drive for and earn money for Lyft.

65. For the above reasons and others, Lyft breached its duty of reasonable care towards Plaintiff.

66. Lyft's breach was the legal cause of Plaintiff's harassment and assault, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

67. As a direct and legal cause of Lyft's general negligence, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT TWO - NEGLIGENT HIRING, SUPERVISION, AND RETENTION

68. The preceding paragraphs of this Complaint are incorporated by reference.

69. Defendant Lyft and DOES 1 through 50, inclusive hired Lyft DRIVER.

70. Lyft did not interview, check the references of, provide training to, or advise Lyft DRIVER of any anti-sexual assault policies when hiring him.  Lyft had no reasonable basis for believing that Lyft DRIVER was fit to drive vulnerable passengers around and failed to use reasonable care in determining whether he was fit for the task. Lyft should have known of Lyft DRIVER's unfitness but failed to use reasonable care to discover his unfitness and incompetence.

71. Despite failing to reasonably endeavor to investigate Lyft DRIVER's incompetence for transporting vulnerable passengers in a moving vehicle, Lyft employed Lyft DRIVER.

72. Lyft knew or should have known that assigning the task of transporting vulnerable passengers late at night to an inadequately screened driver created an unreasonable risk of harm to Lyft's passengers, including Plaintiff, particularly when Lyft had been on notice of the string of sexual harassments and assaults committed by Lyft's drivers.

73. Lyft failed to employ measures to adequately supervise its drivers.

74. Lyft failed to adequately record, investigate and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Lyft drivers.

75. Lyft was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, particularly vulnerable female passengers traveling alone.

76. Lyft DRIVER was and/or became unfit to perform the work for which he was HIRED as he improperly and illegally took advantage of Lyft's passenger Plaintiff when she attempted to use the service for a safe ride home, thereby causing her psychological and physical harm.

77. Because of Lyft DRIVER's unfitness to perform the task of transporting Plaintiff, Plaintiff was sexually assaulted and harassed, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

78. Lyft's and DOES 1 through 50's, inclusive, negligence in hiring, retaining, and or supervising caused Plaintiff's sexual harassment and assault, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

79. As a direct and legal result of Lyft's general negligence, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

### COUNT THREE - COMMON CARRIER NEGLIGENCE

80. The preceding paragraphs of this Complaint are incorporated by reference.

81. At the time that Plaintiff was harassed and assaulted, Lyft was a common carrier as it provided transportation to the general public.

82. Lyft provides transportation through a digital application made available to the general public for the purpose of transporting its users, the passengers, from place to place for profit. Lyft has widely offered its services to the general public and charges standard fees for its services

through its application. Lyft does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation.   Any member of the public can use Lyft's services for transportation.

83. As a common carrier, Lyft must carry its passengers, including Plaintiff, safely.

84. Lyft has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company. Lyft has a duty to do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

85. Lyft must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

86. Despite complaints to Lyft of sexual assaults committed by Lyft drivers and lawsuits against Lyft for sexual assault, Lyft has failed to implement safety precautions that would address the sexual harassment and assault problem.

87. Lyft does not provide a consistent and reliable way for passengers to report sexual abuse and rape.

88. Lyft does not warn passengers of the dangers of riding with Lyft and fails to warn passengers of past complaints regarding Lyft drivers.

89. Lyft does not have an effective program in place to deal with the sexual predator crisis posed by some of its drivers.

90. Lyft knows that its female passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its drivers are sexual predators.

91. Lyft has not exercised reasonable care to protect its passengers from harassment, assault, and rape by Lyft's drivers.

92. Lyft has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Lyft. If Lyft had used the highest degree of care, Lyft could have prevented or dramatically reduced the likelihood of the sexual harassment and assault of its passengers, including Plaintiff.

93. Lyft failed to safely transport Plaintiff.

94. Lyft failed to use the utmost care and vigilance to protect Plaintiff from its own driver who sexually harassed and assaulted Plaintiff while she was being transported by Lyft.

95. Lyft failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of sexual assault, harassment and/or rape by its drivers. If Lyft had used the highest degree of care, Lyft could have prevented or reduced the likelihood of the sexual harassment and assault of its passengers, including Plaintiff.

96. As a legal and direct result of the aforementioned conduct and omission of Defendants Lyft and DOES 1 through 50, inclusive, Plaintiff was sexually assaulted and harassed which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The sexual harassment and assault on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover.

97. As a direct and legal result of Lyft's negligence, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT FOUR - NEGLIGENT FAILURE TO WARN

98. The preceding paragraphs of this Complaint are incorporated by reference.

99. Lyft's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

100.    In operating its business, Lyft knew and had reason to know that its passengers were at risk of sexual harassment, assault, and abuse by Lyft's drivers since as early as 2015. Since 2015, Lyft has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Lyft's passengers by Lyft's drivers.

101.    Despite the knowledge of the danger its enterprise creates, Lyft did not alert its passengers, including Plaintiff, to the risk of sexual harassment and assault by Lyft drivers. In fact, Lyft continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers.

102.    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers.

103.    Lyft itself represented to its passengers that riding with Lyft is safe, implying it's free of risk from sexual harassment and assault.

104.    Defendant Lyft had reason to know that passengers would be unaware of the risk of sexual harassment and assault by Lyft drivers.

105.    A warning to its passengers that they were at risk of sexual harassment and assault by Lyft drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assault she suffered at the hands of her Lyft driver.

106.    As a legal and direct result of the aforementioned conduct and omission of Defendants Lyft and DOES 1 through 50, inclusive, Plaintiff was sexually harassed and assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer serious psychological and physical harm from which she may never fully recover.

107.    As a direct and legal result of Defendant Lyft's failure to warn, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT FIVE - VICARIOUS LIABILITY/LIABILITY FOR THE TORTS OF LYFT DRIVERS

108.    Plaintiff incorporates by reference the preceding paragraphs.

109.    Lyft is vicariously liable for the torts of its drivers through the theories of respondeat superior, nondelegable duties, agency, and ostensible agency. Lyft's liability for the acts of its drivers is not contingent upon the classification of its drivers as employees.

110.    Under the doctrine of respondeat superior, Lyft is responsible for the torts of its employees committed within the scope of employment. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others should bear the costs of the injury instead of the innocent injured Plaintiff.

111.    Lyft profits from transporting vulnerable passengers. Lyft encourages such passengers to use its services. At the same time, Lyft does not take reasonable steps to protect its passengers or warn them of the dangers of riding with Lyft. Lyft, and not the victims of Lyft's negligence, should bear the costs of injuries that result from torts such as sexual assault, kidnapping, and rape.

112.    Lyft drivers are employees. Lyft reserves the right to control the activities of Lyft drivers. Lyft controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before he accepts a ride, and reserves the right to terminate drivers with or without cause.

113.    Lyft DRIVER's sexual harassment and assault of Plaintiff occurred within the scope of Lyft DRIVER's employment and/or authority. The harassment and assault of unaccompanied women who have been placed in an improperly screened Lyft driver's car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

114.    Lyft may maintain that its drivers are contractors and not employees. Nevertheless, whether Lyft DRIVERs are characterized as contractors, employees or agents, Lyft has a non-delegable duty to transport its passengers safely.

115.    The doctrine of nondelegable duty recognizes when one party owes a duty to another which, for public policy reasons, cannot be delegated. It operates to ensure that when a harm occurs the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a

contractor in order to evade its own responsibilities.  This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors in order to further the employer's pecuniary interests.[1]

116.     In advertising to passengers that Lyft provides them a safe ride to their destinations and by profiting off of women who use Lyft for that very purpose and are harassed or attacked, Lyft has a duty to its passengers that cannot be delegated. To allow Lyft to delegate the liability for harassment and assaults by its drivers to anyone else would encourage Lyft to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Lyft would be disincentivized from hiring only competent drivers, since the more drivers Lyft has, the more money Lyft makes.

117.     Further, Lyft drivers act as agents of and operate as extensions of Lyft.  Lyft drivers represent Lyft's business and further Lyft's pecuniary interests.

118.     Lyft drivers display the Lyft logo when interacting with passengers, and in many cases Lyft drivers are the only people with whom Lyft's passengers have direct contact. Lyft drivers provide the service that Lyft claims to provide transportation.

119.     By allowing Lyft drivers to represent Lyft's business, Lyft creates the impression that its drivers, including Lyft DRIVER, were Lyft's employees and/or agents.

120.     Plaintiff reasonably believed that Lyft DRIVER was an employee or agent of Lyft, and, relying on this belief, hired Lyft DRIVER and suffered harm as a result of her contact with Lyft DRIVER.

121.     For these reasons and others, Lyft is vicariously liable for the tortious acts of its drivers, regardless of whether Lyft's drivers are employees, agents, apparent agents, or contractors of Lyft.

## **COUNT SIX - VICARIOUS LIABILITY FOR SEXUAL ASSAULT**

---

[1] *See*, for example, *Barry v. Raskov* (Ct. App. 1991) 232 Cal. App. 3d 447, 454, 456 (where the court recognized that allowing a broker to delegate the liability for the fraudulent torts of its contractor would allow the brokers to evade their responsibilities by allocating them among unlicensed contractor which subverts upgraded standards and protection to the consuming public).

122.     The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

123.     At the time that Plaintiff was sexually assaulted, Lyft DRIVER intended to cause harmful and offensive contact with Plaintiff, and placed Plaintiff in reasonable apprehension of imminent harmful and offensive contact. He intentionally and recklessly did acts which placed Plaintiff in apprehension of imminent harm.

124.     As a result, Plaintiff was assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

125.     Lyft DRIVER committed these tortious and wrongful acts while acting in the course and scope of his employment with Lyft as an employee/agent of Lyft. Therefore, Lyft is liable for Lyft DRIVER's assault of Plaintiff and is responsible for damages caused by said conduct under the principles of vicarious liability, including the doctrine of respondeat superior. Even if Lyft DRIVER had not been an employee, Lyft's duty to provide transportation free of assault is nondelegable and Lyft is liable for Lyft DRIVER's actions, because to allow Lyft to delegate its duty of providing the safe transportation it promises would incentivize Lyft to create a greater risk of harm to the public.

126.     Under the theories of respondeat superior, nondelegable duty, agency, and ostensible agency, Lyft is liable for the tortious acts of Lyft DRIVER.

127.     As a legal result of Lyft DRIVER's sexual assault, Plaintiff has suffered economic and general, non-economic damages according to proof.

## COUNT SEVEN - VICARIOUS LIABILITY FOR SEXUAL BATTERY

128.     The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

129.     Lyft DRIVER made harmful and offensive contact with the Plaintiff.  Plaintiff did not consent to the contact. Plaintiff was harmed and offended by Lyft DRIVER's contact with her. Lyft DRIVER intentionally and recklessly did acts which resulted in harmful contact with Plaintiff's person.

130.    As a result of Lyft DRIVER's sexual battery, which occurred while in the course and scope of Lyft DRIVER's employment, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

131.    As a legal result of Lyft DRIVER's sexual battery, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

132.    Lyft is vicariously liable for the torts of its driver under the theory of respondeat superior, the nondelegable duty doctrine, agency, and ostensible agency.

## COUNT EIGHT - INTENTIONAL MISREPRESENTATION

133.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

134.    At the time that Plaintiff was sexually assaulted, she had downloaded the Lyft application and had an account with Lyft.

135.    Lyft represented to Plaintiff and the general public that safety was Lyft's top priority and it was Lyft's goal to make every ride safe, comfortable, and reliable. At the same time, Lyft already knew that a number of its drivers had preyed on vulnerable female passengers by sexually molesting, harassing, assaulting and/or raping them.

136.    Lyft made intentional misrepresentations of fact to Plaintiff known by Defendant to be false including the false statement that Defendant would provide Plaintiff with a safe ride to her destination.

137.    Lyft made these intentional misrepresentations of material fact in order to induce young women, including Plaintiff, into using Lyft's services.

138.    Lyft made these representations to Plaintiff and the general public despite knowing that it had chosen not to take the measures necessary to provide a safe ride home, and that, as a result, continued sexual harassment and assault of its passengers by its drivers was a foreseeable occurrence.  Lyft made these representations in order to induce women like the Plaintiff into using Lyft's services and to derive profit from women like Plaintiff.

139.    In getting into the Lyft Plaintiff ordered, Plaintiff reasonably relied on Lyft's representations that it would get her safely to her destination.

140.    In trusting and relying on Lyft's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by Lyft's employee Lyft DRIVER who sexually assaulted Plaintiff against her will.

141.    As a legal result of Lyft's intentional misrepresentation, Plaintiff was sexually assaulted and harassed which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

142.    As a legal result of Lyft's intentional misrepresentation, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

### COUNT NINE - NEGLIGENT MISREPRESENTATION

143.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

144.    Lyft represented to Plaintiff and the general public that safety is Lyft's top priority and it is Lyft's goal to make every ride safe, comfortable, and reliable.  At the time of the assault alleged herein, Lyft knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually harassing, molesting, assaulting and/or raping them.

145.    Lyft continued to represent that its services were safe in order to further Lyft's own pecuniary interests.

146.    In representing to vulnerable passengers that its services were safe, Lyft had a duty to provide correct and accurate information about the actual safety of its services.

147.    Lyft knew or should have known that it could not provide the safe ride that it represented it could.

148.    Knowing of the incidence of sexual harassment and assault of its passengers by its drivers and knowing that Lyft had not implemented adequate precautions, Lyft had no reasonable grounds for believing that it could provide Plaintiff and other similarly vulnerable female passengers a safe ride home as represented.

149.     In getting into the Lyft Plaintiff ordered, Plaintiff reasonably relied on Lyft's representations that it would get her safely to her destination.

150.     In trusting and relying on Lyft's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by Lyft's employee, Lyft DRIVER, who sexually assaulted Plaintiff against her will.

151.     As a legal result of Defendant Lyft's aforementioned conduct, Plaintiff was sexually harassed and assaulted which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover.

152.     As a legal result of Lyft's Negligent Misrepresentation, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT TEN - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153.     Plaintiff hereby incorporates by reference the preceding causes of action and factual allegations.

154.     For several years prior to the assault of Plaintiff by Lyft DRIVER, Lyft was fully aware that other female passengers had been sexually harassed, assaulted, and raped by Lyft drivers. Since 2015, Lyft has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Lyft's passengers by Lyft's drivers.

155.     Lyft made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers in order to identify and terminate drivers who were sexual predators.

156.     Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Lyft drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft decided not to

1    implement such precautions and instead continues to place its passengers at greater risk of sexual

2    harassment, assault and rape by Lyft's own drivers.

3        157.    Additional safety precautions that Lyft chose not to make include but are not limited

4    to: ongoing monitoring of Lyft through available technology including cameras and GPS; a zero

5    tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with

6    passengers, or by deviating substantially from the assigned route; a zero-tolerance program for

7    sexual assault and guidelines mandating immediate termination; creating and instituting a system

8    encouraging customer reporting; and adequate monitoring of customer complaints by well-trained

9    and effective customer service representatives. Lyft chose not to implement such precautions.

10        158.    In failing to take these and other safety precautions designed to protect female

11    passengers from sexual predators driving for Lyft, Lyft breached its duty of reasonable care,

12    negligently inflicting emotional harm, and acted recklessly and in conscious disregard of the safety

13    of its female passengers.

14        159.    As a direct and legal result of Lyft's negligent infliction of emotional distress,

15    Plaintiff has suffered damages, both economic and general, non-economic damages according to

16    proof.

17    **COUNT ELEVEN - BREACH OF CONTRACT**

18        160.    Plaintiff hereby incorporates by reference all the preceding allegations.

19        161.    Plaintiff entered into a contract with Lyft. The essence of this commercial transaction

20    was the payment of a fee to Lyft in exchange for safe and reasonable transportation to her

21    destination.

22        162.    As a result of the conduct, acts and omissions set forth above, Lyft breached its

23    contract with Plaintiff, including breaching implied covenants which would be inherent in such a

24    contract.

25        163.    As a legal result of Lyft's Breach of Contract, Plaintiff has suffered damages, both

26    economic and general, non-economic damages according to proof.

27    **COUNT TWELVE - STRICT PRODUCT LIABILITY BASED DESIGN DEFECT**

28

164.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

165.    Lyft developed, designed, manufactured, and marketed the Lyft app and controls all aspects of the design, and functionality of the Lyft app.

166.    The Lyft app is mass-marketed and mass-produced.

167.    Lyft placed the Lyft app into the stream of commerce when it made the Lyft app available to end users or consumers to download or purchase through various online app stores.

168.    The Lyft app is a self-contained computer or software program that end users or consumers purchase or download from online stores, including but not limited to the Apple Store or Google Play Store. Users then download the self-contained computer or software program onto their personal mobile device.

169.    The Lyft App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because the Lyft app was designed with an algorithm that matched female passengers with male drivers and had no modification to allow female passengers the option to be matched only with female drivers at the time Plaintiff was assaulted by the Lyft driver.  Lyft could have, but did not, modify its matching algorithm on the backend to give female passengers the option to select female drivers. Such a modification is feasible because Lyft has made such modifications now. At the time Plaintiff was assaulted, Lyft had not modified the code of the matching algorithm on the Lyft App available in the United States market to allow for female Lyft passengers, including Plaintiff, to choose gender-matched rides. Lyft knew that a gender-matching option would have prevented assaults like the one suffered by Plaintiff. Had a gender-matching functionality been available, Lyft would have toggled it on for the ride in question. Use of the gender-matching option would have prevented her assault by her male driver because Plaintiff never would have been in the car with this driver had a gender matching functionality been toggled on and would, instead, have been paired with an entirely different person.

170.    The Lyft App was in a defective condition unreasonably dangerous to users or consumers, including Plaintiff, because it could have been, but was not, designed to trigger automatic video recording of rides and the time period immediately around them, whether through

1  using the camera already installed on a driver's cell phone during Lyft trips, or through an external

2  device linked to the App. The presence of cameras serves a deterrent function that significantly

3  reduces and prevents sexual assault and misconduct. Even the potential for a ride to be recorded

4  serves a deterrent function that significantly reduces and prevents sexual assault and misconduct.

5  Had the Lyft App included automatic video monitoring of rides, by definition that feature would

6  have been engaged on Plaintiff's ride. Automatic video monitoring would have deterred the driver

7  from assaulting Plaintiff.

8       171.    The Lyft App was in a defective condition unreasonably dangerous to users or

9  consumers, including Plaintiff, because the Lyft app collected throughout trips data on the driver

10  and rider location and progress toward the destination. This data gave Lyft the capability to detect

11  when a ride deviated from an expected route, when a driver stopped for an unusual amount of time,

12  or when a driver and rider stayed in proximity after a ride concluded – all indicators of a sexual

13  assault incident like what happened to Plaintiff. Lyft could (and should) have designed the code of

14  the app to use GPS technology it already built into the app to automatically trigger safety alerts in

15  the event of such deviations. An appropriately designed GPS alert would have triggered an alert

16  during Plaintiff's ride and would have prevented the sexual assault of Plaintiff or, at a minimum,

17  lessened the severity of the assault by deterring the assault in the first place or summoning an

18  intervention.

19            **COUNT THIRTEEN - STRICT PRODUCT LIABILITY FAILURE TO WARN**

20       172.    The preceding paragraphs of this Complaint are re-alleged and incorporated by

21  reference.

22       173.    Lyft manufactured and distributed the Lyft App.

23       174.    The Lyft App presented potential risks of introducing each driver to a plaintiff victim

24  who, because of the nature of the nature of the ridesharing arrangement created and facilitated by

25  the Lyft App, could neither escape from the driver's vehicle nor control the place where the driver

26  would take the plaintiff victim; these are risks that were known or knowable at the time of

27  manufacture and distribution of the Lyft App.

28

175.    The potential risks presented a substantial danger when the Lyft App was used or misused in an intended or reasonably foreseeable way.

176.    Ordinary consumers such as the Plaintiff would not have recognized the potential risks because Lyft did not publicize either the true rate of sexual assaults on the Lyft app, or the rate of sexual assaults correlated with: male and female route pairings, recorded vs. unrecorded rides, or route deviations. Only Lyft had access to this data.

177.    Lyft did not warn passengers that, in the absence of functionalities to match female riders with only female drivers, record rides, or summon help in the event of a route discrepancy, riders were at a greater risk of harm from sexual assault than without such functionalities – and did not warn riders that the "safety" features Lyft had built into the Lyft app were not adequate to prevent sexual assaults.

178.    Defendant Lyft failed to adequately warn of the potential risks.

179.    Had Plaintiff received such a warning, she would not have ridden with Lyft or would not have ridden alone with Lyft.

180.    Plaintiff was sexually assaulted and harmed.

181.    The lack of sufficient warnings was a substantial factor in causing the harm suffered by Plaintiff.

## **PUNITIVE DAMAGES**

182.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

183.    As stated above, Lyft knew that it faced an ongoing problem of sexual predators driving for Lyft and assaulting its passengers. As early as 2015 Lyft knew that its drivers were sexually harassing and assaulting female passengers. Since 2015, Lyft has received frequent passenger complaints about driver sexual misconduct, including sexual assault and rape, it has been notified of police investigations of the criminal sexual conduct of drivers acting within their capacity as Lyft drivers, and it has been the subject of numerous civil suits alleging the sexual harassment and sexual assault of Lyft's passengers by Lyft's drivers.

184.   Nevertheless, even though Lyft was fully aware of its sexual predator problem it failed to take safety precautions to protect its passengers.

185.   Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, ongoing monitoring of Lyft drivers and rides through available technology including cameras and GPS; a zero tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route, a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride, a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route ; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers, creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer service representatives, warnings to passengers of the dangers of being attacked by Lyft drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, rape, and exploitation by Lyft's own drivers.

186.   As such Lyft acted, and continues to act, recklessly and in knowing, conscious disregard of the safety of its passengers and the public safety.

187.   As a legal result of the aforementioned negligent, reckless and grossly negligent conduct of Defendants Lyft and DOES 1 through 50, inclusive, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

188.   As a result of her sexual assault, Plaintiff suffered serious emotional distress.

189.   As a result of Lyft's misconduct as stated above, Plaintiff prays for exemplary damages to punish Lyft for its misconduct and to deter future misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against all Defendants as follows:

COMPLAINT FOR DAMAGES

1. For general damages (also known as non-economic damages), including but not limited to, past and future pain and suffering, in an amount in excess of the jurisdictional minimum, according to proof;

2. For special damages (also known as economic damages), including but not limited to past and future hospital, medical, professional, and incidental expenses as well as past and future loss of earnings, loss of opportunity, and loss of earning capacity, in excess of the jurisdictional minimum, according to proof;

3. For exemplary and punitive damages according to proof;

4. For prejudgment interest, according to proof;

5. For costs of suit incurred herein, according to proof;

6. For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all causes of action.

Dated: 2/17/2026

Respectfully Submitted,

/s/ Ruth Rizkalla
Ruth Rizkalla
rrizkalla@carlsonattorneys.com
Michael McDowell
mmcdowell@carlsonattorneys.com
1230 Rosecrans Ave Suite 300
Manhattan Beach CA, 90266
Tel: (254) 526-5688
Fax: (254) 526-8204

COUNSEL FOR PLAINTIFF

COMPLAINT FOR DAMAGES